**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

In Re:  Oil Spill by the Oil Rig "Deepwater      *        MDL NO.      2179
      Horizon" in Gulf of Mexico, on

      **April, 20, 2010**                                    *        **SECTION J**

                                                                         *        **JUDGE BARBIER**

      This document relates to:                                    **MAG. JUDGE WILKINSON**
      All cases in Pleading Bundle B3
                                                                         *

_____

CHRIS ALBERT MARTIN AND                          CIVIL ACTION NO._____
JENNIFER MARTIN,

   PLAINTIFFS,                                                    SECTION J

VERSUS                                                              JUDGE BARBIER

BP EXPLORATION & PRODUCTION INC.,            MAG. JUDGE WILKINSON
BP AMERICA PRODUCTION COMPANY,
BP, P.L.C., TRANSOCEAN LTD, TRANSOCEAN
OFFSHORE DEEPWATER DRILLING INC.,
TRANSOCEAN DEEPWATER INC,
TRANSOCEAN HOLDINGS LLC,
TRITON ASSET LEASING GMBH,
HALLIBURTON ENERGY SERVICES, INC.,

   DEFENDANTS.
   _____

**COMPLAINT**

      COME NOW the Plaintiffs, CHRIS ALBERT MARTIN AND JENNIFER MARTIN, by

and through undersigned counsel, and sue the Defendants, BP EXPLORATION &

PRODUCTION, INC., a Delaware corporation, BP AMERICA PRODUCTION COMPANY, a

Delaware corporation, BP, P.L.C., a Foreign corporation,  TRANSOCEAN LTD a Swiss

Corporation, TRANSOCEAN OFFSHORE DEEPWATER DRILLING INC., a Delaware

corporation, TRANSOCEAN DEEPWATER INC, a Delaware corporation, TRANSOCEAN HOLDINGS LLC, a Delaware corporation, TRITON ASSET LEASING GMBH, a Foreign corporation, HALLIBURTON ENERGY SERVICES, INC., a Delaware corporation:

## PARTIES

1.    Plaintiff, CHRIS ALBERT MARTIN, is a citizen resident of Santa Rosa Beach, Florida and is over the age of 19.  MR. MARTIN swam in the Gulf of Mexico and based upon information and belief was toxically exposed to crude oil and chemical dispersants from the Deepwater Horizon Oil Spill Disaster.  Upon information and belief, MR. MARTIN was also toxically exposed as a coastal resident via inhalation and dermal exposure to crude oil and dispersants from the Deepwater Horizon Oil Spill Disaster.

2.    Plaintiff, JENNIFER MARTIN, is a citizen resident of Santa Rosa Beach, Florida and is over the age of 19. As a result of her husband CHRIS MARTIN's exposure related injuries, MRS. MARTIN suffers and will continue to suffer the loss of her spouse's services, support, consortium and the care and comfort of his society.

3.    Defendant, BP EXPLORATION & PRODUCTION, INC. is a Delaware corporation, at all pertinent times registered to do and doing business in the State of Louisiana, and/or its territorial waters, whose principal business establishment and registered business office is 501 Westlake Park Blvd., Houston, Texas 77079, and whose agent for service of process is C.T. Corporation Systems, 5615 Corporate Blvd., Ste. 400B, Baton Rouge, LA.

4.    BP EXPLORATION & PRODUCTION, INC. was a holder of a lease granted by the former Minerals Management Service ("MMS") allowing it to perform oil exploration, drilling, and production-related operations in Mississippi Canyon Block 252, the location known as "Macondo" where the Oil Spill originated.

5.      The MMS, a federal entity that divides the Gulf of Mexico's seafloor into rectangular "block," and then auctions the right to drill for oil and gas beneath those blocks of seafloor, was reorganized as the Bureau of Ocean Energy Management, Regulation, and Enforcement (BOEMRE) on June 18, 2012; however, it is referred to as the MMS throughout this Amended Complaint.

6.      BP EXPLORATION & PRODUCTION, INC. was designated as a "Responsible Party" by the U.S. Coast Guard under the Oil Pollution Act of 1990, 33 U.S.C. § 2714.  This court has personal jurisdiction over BP EXPLORATION & PRODUCTION COMPANY because it is registered to do business in Louisiana, does business in Louisiana and has a registered agent in Louisiana.

7.      Defendant, BP AMERICA PRODUCTION COMPANY, is a Delaware corporation, at all pertinent times registered to do and doing business in the State of Florida, and/or its territorial waters, whose principal business establishment and registered business office is 501 Westlake Park Blvd., Houston, Texas 77079, and whose agent for service of process is C.T. Corporation System, 5615 Corporate Blvd., Ste. 400B, Baton Rouge, LA.  BP AMERICA PRODUCTION COMPANY was the party to the Drilling Contract with Transocean Ltd. for the drilling of the Macondo well by the Deepwater Horizon vessel.  This Court has personal jurisdiction over BP AMERICA PRODUCTION COMPANY because it is registered to do business in Louisiana, does business in Louisiana and has a registered agent in Louisiana.

8.      Defendant, BP, P.L.C. is a foreign corporation with its corporate headquarters in London, England, at all pertinent times doing business in the State of Florida.  BP, P.L.C. is the global parent company of the worldwide business operating under the "BP" logo.  BP, P.L.C. is one of the world's largest energy companies with over 80,000 employees and $239 billion in

revenues in 2009. BP, P.L.C. operates its various business divisions, such as the "Exploration and Production" division in which BP EXPLORATION & PRODUCTION, INC. and BP AMERICA PRODUCTION COMPANY fall, through vertical business arrangements aligned by product or service groups. BP, P.L.C.'s operations are worldwide, including in the United States. Defendants BP EXPLORATION & PRODUCTION, INC. and BP AMERICA PRODUCTION COMPANY (collectively "BP") are wholly-owned subsidiaries of BP P.L.C. and are sufficiently controlled by BP, P.L.C. so as to be BP, P.L.C.'s agents in Louisiana and the U.S. more generally.

9.     BP, P.L.C. has submitted to Federal Court jurisdiction by responding to various Plaintiffs' discovery requests in Federal Court.

10.     BP, P.L.C. states that it is the leading producer of oil and natural gas in the United States and the largest investor in U.S. energy development. A sampling of BP, P.L.C.'s contact with the U.S are as follows: (a) BP, P.L.C.'s American Depository Shares are listed on the New York Stock Exchange and BP, P.L.C. is the largest non-U.S. company listed on the NYSE; (b) roughly 40% of BP's shares are owned by U.S. individuals and institutions; (c) BP, P.L.C. files annual reports with the U.S. Securities and Exchange Commission; (d) approximately 60% of BP, P.L.C.'s fixed assets are located in the U.S. or the European Union; and (e) BP, P.L.C. reports having 2,100 U.S.-based employees in non-Exploration & Production, non-Refining & Marketing BP entities.

11.     This Court has jurisdiction over BP, P.L.C. pursuant to Louisiana's long-arm statute, in combination with Rule 4(k)(1)(A) of the Federal Rules of Civil Procedure. BP, P.L.C. does business in Louisiana and has had continuous and systematic contacts with Louisiana (and with the U.S. more generally).

12.     Alternatively, this Court may exercise personal jurisdiction over BP, P.L.C. pursuant to Rule 4(k)(2) of the Federal Rules of Civil Procedure because claims in this action arise under federal law, the exercise of jurisdiction over BP, P.L.C. is consistent with the United States Constitution and laws, and BP, P.L.C. has been served with summonses in individual complaints that allege similar causes of action to those alleged in this Complaint.

13.     Plaintiffs' causes of action arise out of wrongful conduct committed by BP, P.L.C., directly or indirectly by its agents, that caused injury or damage in Louisiana by an offense or quasi offense committed through an act or omission inside and outside of Louisiana. BP, P.L.C. regularly does or solicits business, or engages in any other persistent course of conduct, or derives revenue from goods used or consumed or services rendered in Louisiana. These acts or omissions took place both before the blowout resulting in the Oil Spill and in the negligent conduct of BP, P.L.C. after the blowout in attempting to contain the Oil Spill.

14.     In addition, this Court also has personal jurisdiction over BP, P.L.C. under agency and alter ego principles, because BP, P.L.C.'s agents, BP AMERICA PRODUCTION COMPANY and BP EXPLORATION & PRODUCTION, INC., do business in Florida.  BP AMERICA PRODUCTION COMPANY and BP EXPLORATION & PRODUCTION, INC. are both wholly-owned subsidiaries of BP, P.L.C.  In BP, P.L.C's Annual Report for 2009, in which it presents a consolidated financial statement that includes BP AMERICA PRODUCTION COMPANY and BP EXPLORATION & PRODUCTION, INC., BP, P.L.C. states that it "controls" both BP AMERICA PRODUCTION COMPANY and BP EXPLORATION & PRODUCTION, INC., among other subsidiaries, meaning that it has "the power to govern the financial and operating policies of the [subsidiary] so as to obtain benefit from its activities…."

15.     Moreover, BP, P.L.C. undertook the duty to pay and/or gratuitously to clean up the Oil Spill and as a result is liable for its acts and omissions in the attempt to clean-up the Oil Spill.

16.     BP EXPLORATION & PRODUCTION, INC., BP AMERICA PRODUCTION COMPANY and BP, P.L.C. are generally referred to collectively as "BP." As lease operator of the Macondo prospect site, BP was responsible for assessing the geology of the prospect site, engineering the well design, obtaining regulatory approvals for well operations, and retaining and overseeing the contractors working on the various aspects of the well and the drilling operations.

17.     Defendant, TRANSOCEAN LTD. ("TRANSOCEAN LTD."), is a Swiss corporation that maintains substantial U. S. offices at 4 Greenway Plaza, Houston, Texas, 77046, and that at all pertinent times was doing business in the State of Louisiana and within this district.   According to its Complaint and Petition for Exoneration from or Limitation of Liability, TRANSOCEAN LTD. was an owner, managing owner, owner *pro hac vice*, and/or operator of the Deepwater Horizon and participated in the Deepwater Horizon's offshore oil drilling operations at the Macondo prospect, where the Oil Spill originated.

18.     Defendant, TRANSOCEAN OFFSHORE DEEPWATER DRILLING INC. ("TRANSOCEAN OFFSHORE"), is a Delaware corporation with its principal place of business in Houston, Texas, and that at all pertinent times was doing business in the State of Louisiana and within this district.   Defendant, TRANSOCEAN OFFSHORE, is an owner, managing owner, owner *pro hac vice*, and/or operator of the Deepwater Horizon and participated in the Deepwater Horizon's offshore oil drilling operations at the Macondo prospect, where the Oil Spill originated.

19.     Defendant,    TRANSOCEAN    DEEPWATER    INC.    ("TRANSOCEAN DEEPWATER"), is a Delaware corporation with its principal place of business in Houston, Texas, and that at all pertinent times was doing business in the State of Louisiana and within this district.  Defendant, TRANSOCEAN DEEPWATER, is an owner, managing owner, owner *pro hac vice*, and/or operator of the Deepwater Horizon and participated in the Deepwater Horizon's offshore oil drilling operations at the Macondo prospect, where the Oil Spill originated.

20.     Defendant,    TRANSOCEAN    HOLDINGS    LLC    ("TRANSOCEAN HOLDINGS"), is a Delaware corporation with its principal place of business in Houston, Texas, and that at all pertinent times was doing business in the State of Louisiana and within this district.  Defendant, TRANSOCEAN HOLDINGS, is affiliated with TRANSOCEAN LTD. and is a wholly-owned subsidiary of TRANSOCEAN OFFSHORE. TRANSOCEAN HOLDINGS is an owner, managing owner, owner *pro hac vice*, and/or operator of the Deepwater Horizon and participated in the Deepwater Horizon's offshore oil drilling operations at the Macondo prospect, where the Oil Spill originated. More specifically, TRANSOCEAN HOLDINGS is party to the contract with BP regarding the lease of the Deepwater Horizon for drilling operations in the Gulf of Mexico. On April 28, 2010, the U.S. Coast Guard named TRANSOCEAN HOLDINGS as a "Responsible Party" under the Oil Pollution Act for the surface oil spill resulting from the explosion aboard the Deepwater Horizon.

21.     Defendant, TRITON ASSET LEASING GMBH ("TRITON"), is a Swiss limited liability company with its principal place of business in Zug, Switzerland. Defendant, TRITON, is affiliated with TRANSOCEAN LTD. and is an owner, managing owner, owner *pro hac vice*, and/or operator of the Deepwater Horizon.

22.     Defendants, TRANSOCEAN LTD., TRANSOCEAN DEEPWATER, TRANSOCEAN OFFSHORE, TRANSOCEAN HOLDINGS, and TRITON, are hereinafter referred to collectively as "TRANSOCEAN." At the Macondo site, TRANSOCEAN provided the Deepwater Horizon vessel and personnel to operate it. At all times relevant to the Oil Spill, Transocean, subject to BP's inspection and approval, was responsible for maintaining well control equipment, such as the blowout preventer and its control systems. TRANSOCEAN also provided operational support for drilling-related activities on board the Deepwater Horizon, as well as onshore supervision and support for those drilling activities at all times relevant to the Oil Spill.

23.     Defendant, HALLIBURTON ENERGY SERVICES, INC. is a Delaware corporation with its principal place of business in Houston, Texas. Halliburton is licensed to do and does business in the State of Louisiana. HALLIBURTON provided engineering services, materials, testing, mixing, and pumping for cementing operations on board the Deepwater Horizon, as well as onshore engineering support for those operations. HALLIBURTON was responsible for the provision of technical advice about the design, modeling, placement, and testing of the cement that was used in the Macondo well. At and before the time of the blowout, HALLIBURTON was engaged in cementing operations to isolate the hydrocarbon reservoirs and seal the bottom of the well against the influx of hydrocarbons like gas and oil.

24.     HALLIBURTON division Sperry Drilling Services (formerly Sperry Sun Drilling Services) was responsible for mudlogging personnel and equipment on the Deepwater Horizon, including downhole drilling tools. Sperry mudlogging personnel were partially responsible for monitoring the well, including mud pit fluid levels, mud flow in and out of the well, mud gas

levels, and pressure fluctuations. Throughout this Amended Complaint, "HALLIBURTON" shall refer to both Halliburton Energy Services, Inc. and its Sperry division.

25.     Each of these Defendants is jointly, severally, and/or solidarily liable under various principles of federal, maritime and/or applicable State tort law.

## JURISDICTION AND VENUE

26.     This Court has jurisdiction over this action pursuant to 28 U.S.C. Section 1332(a)(4), because this matter in controversy exceeds the minimum jurisdictional amount of $75,000.00, exclusive of interest and costs, and this case is between Plaintiff and citizens of a State or of different States.

27.     Jurisdiction is also proper under 28 U.S.C. Section 1331, because the claims asserted by Plaintiffs arise under the laws of the United States of America, including the laws of various states which have been declared, pursuant to 43 U.S.C., Section 1331(f)(1) and 1333(a)(2), to be the law of the United States for that portion of the outer continental shelf from which the oil spill originated.  Federal question jurisdiction under 28 U.S.C. §1331 also exists by virtue of Plaintiff's claims brought herein which arise under the Oil Pollution Act of 1990.

28.     Pleading in the alternative, jurisdiction also exists over this action pursuant to The Admiralty Extension Act, 46 U.S.C., §30101, which extends the admiralty and maritime jurisdiction of the United States to cases of injury or damage, to person or property, caused by a vessel on navigable waters, even though the injury or damage is done or consummated on land.

29.     Venue is proper in this District pursuant 28 U.S.C § 1391(b)(1) because one or more the defendants reside in this judicial district. Venue is also proper in this District pursuant to 28 U.S.C § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims alleged in this complaint occurred in this judicial district.

## FACTUAL ALLEGATIONS

30.     This case arises from the April 20, 2010, loss of control of the Macondo well that was being drilled by the Deepwater Horizon drilling vessel and the related explosions on that vessel which caused it to sink and resulted in the discharge of significant amounts of oil that spread throughout the Gulf of Mexico over a period of more than three months.  They also arise due to subsequent additional negligent acts and failure of reasonable care which occurred in Gulf of Mexico's territorial waters.

31.     At all times relevant to this action, the Deepwater Horizon, an ultra-deep water semi-submersible drilling rig, was leased to BP.  At the time of its explosion on April 20, 2010, the Deepwater Horizon was being operated by BP for the purposes of drilling an exploratory well at the Macondo prospect on Mississippi Canyon Block 252 on the Outer Continental Shelf.

32.     The Macondo prospect was being explored pursuant to a ten-year lease, OCS-G32306, granted by the Minerals Management Services on June 1, 2008, and owned at the time of the explosion by BP.  The lease allowed BP to drill for hydrocarbons and perform oil production-related operations in the Mississippi Canyon Block 252 area which includes the Macondo prospect.  BP was designated the lease operator.

## THE BLOWOUT

33.     At approximately 10 p.m. on April 20, 2010, following cementing operations aboard the vessel Deepwater Horizon, workers were finishing drilling operations for the Macondo well and displacing the drilling mud in the marine riser at the direction of BP in preparation for completion pursuant to BP's design, when they encountered an uncontrolled influx of highly pressurized hydrocarbons into the wellbore leading to a "blowout" or loss of control of the well.

34.    The combustible gas flowing uncontrolled into the wellbore traveled quickly up to the rig floor where it was ignited leading to a fiery explosion on the Deepwater Horizon.

35.    Defendant, BP was unable to regain control of the well and the fiery explosions onboard the Deepwater Horizon caused the vessel to be destroyed and sink to the bottom of the Gulf of Mexico.

36.    BP did not follow safe procedures, in order to save money, by electing to utilize a risky well design that provided for fewer barriers against hydrocarbon influx into the wellbore relative to well designs typically used in an unknown and troublesome formation like the Macondo prospect.

37.    Due to the depth of the Macondo well, BP was also negligent in the selection of a casing material that was vulnerable to collapse under high pressure. BP's negligence in well design and casing selection allowed for an increase risk of a blowout.  BP knew or should have known of those risks but chose risk over increased costs.

38.    In addition to the casing-related problems, the float collar installed on the final section of casing likely failed to seal properly, which may have allowed hydrocarbons to leak into the casing, contributing to the April 20, 2010 blowout.

39.    A float collar is a component installed near the bottom of the casing string on which cement plugs land during the cementing job.

40.    Upon information and belief BP was negligent in operations to install the float collar and/or in neglecting warning signs of a potentially improper installation of the float collar.

41.    BP was negligent in preparing the wellbore for cementing operations which led to an increased likelihood that the cement job would fail and a blowout would occur.

42.    BP was negligent in electing to utilize an unsafe cement job design that was

unlikely to create a secure barrier against hydrocarbon influxes into the Macondo wellbore.

43.    BP was negligent in the selection of an improper cement mixture that was susceptible to failure under the high pressures and temperatures typical in the Macondo well.

44.    Negligent cementing operations failed to isolate the well bore from hydrocarbon zones and seal the bottom of the well against an influx of gas. BP was negligent in failing to identify this bad cement job ignoring numerous warning signs in the process.

45.    Upon information and belief, the defective cement job allowed a pathway for highly pressured gas to enter the Macondo wellbore and travel rapidly from there to the rig floor.

46.    BP was negligent in the monitoring and design of the drilling mud program which failed to prevent hydrocarbons from flowing into the wellbore and up to the Deepwater Horizon.

47.    BP was negligent in the decision and design to displace the drilling mud from the marine riser before allowing time for the cement to fully set.

48.    BP was also negligent in conducting and monitoring the displacement operations, failing to recognize the many signs of trouble.

49.    BP was negligent in failing to utilize a casing hanger lockdown sleeve that would have stopped the hydrocarbons from escaping past the wellhead and reaching the rig floor.

50.    BP was negligent in failing to timely identify that hydrocarbons were entering the wellbore during displacement operations and in failing to initiate well control measures.

51.    After hydrocarbons reached the rig floor, the Blowout Preventers (BOP's) for the Deepwater Horizon, failed to activate as designed to prevent the continued uncontrolled flow of gas from the formation.

52.    The BOP utilized by BP was defective and unreasonably dangerous in their manufacture, design, and/or composition, and/or failed to contain adequate warnings and

instructions.

53.    BP failed to ensure that the BOP design used on Deepwater Horizon was sufficient for the drilling conditions and program expected at the Macondo site.

54.    BP was negligent in failing to properly maintain the BOP's for the Deepwater Horizon in accordance with safe practices and federal regulations.

55.    BP failed to ensure that the BOP's possessed the necessary technology to properly function including adequate safeguards and redundant systems to prevent blowouts.

56.    BP failed to ensure that the BOP's and all related systems were properly tested to operational conditions and confirmed to be in good working order.

57.    BP was negligent in failing to properly utilize and maintain emergency systems and equipment on board the Deepwater Horizon or to supervise and/or inspect to assure same.

58.    Defendants' negligent actions and/or omissions caused the blowout of the Macondo well leading to the destruction and sinking of the Deepwater Horizon and subsequent uncontrolled discharge of oil into the Gulf of Mexico.

### Uncontrolled Discharge of Oil into the Gulf and Environmental Implications

59.    After the sinking of the Deepwater Horizon, the well began to release, leak, and/or discharge oil directly into the Gulf of Mexico due to the failure of the well's cement and/or casing and the concurrent failure of the blow-out preventors.

60.    Defendant, BP, recklessly, willfully and/or wantonly failed to ensure that oil would be quickly and fully contained within the immediate vicinity of the Macondo well in the event of a blowout.

61.    The well discharged an estimated 50,000 to 100,000 barrels of oil into the Gulf of Mexico on a daily basis for at least 87 days.

62.     The United States government has estimated that approximately 5,000,000 barrels (210,000,000 gallons) of oil gushed into the Gulf of Mexico during the months that the well was uncontained with others estimating that the well discharged upwards of 7,000,000 barrels.

63.     Defendant, BP, willfully and/or wantonly failed to ensure that adequate safeguards, protocols, procedures and resources would be readily available to prevent and/or mitigate the effects of an uncontrolled discharge from the Macondo well into the Gulf of Mexico and to prevent injuring Plaintiffs.

64.     This massive release of oil contaminated thousands of square miles of waters in the Gulf as the well flowed uncontained for three months resulting in the ban of recreational and commercial fishing by the government in many areas during that time period.

65.     The oil discharged into the Gulf of Mexico from the Macondo well contained hydrocarbon molecules, carcinogens and other toxic pollutants including heavy metals which are extremely hazardous to the marine ecosystem in the Gulf of Mexico including into the environment where Plaintiffs work, live and enjoy the recreational activities of swimming, fishing and boating.

66.     After the explosions, BP attempted to downplay and conceal the severity of the Oil Spill.  Government investigators have found BP's initial leak estimate of 1,000 barrels a per day to be a fraction of its measured leakage amount, which in fact exceeded 50,000 barrels per day.  Additionally, an internal BP document from around the time of the spill shows that the company's own analysis had actually estimated that the rate of oil spillage could reach 100,000 barrels, or 4,200,000 gallons, per day.

67.     Each day during the course of the Oil Spill, tens of thousands of barrels of crude oil gushed from the wellhead and broken riser, bubbling up to the surface and flattening out into

a widening slick of oil, as well as spreading out in vast subsurface plumes.  On the surface, the shifting mass was large enough to be visible from outer spaces, at times covering tens of thousands of square miles, spreading with the wind and currents towards the Gulf States' coastlines.

68.    Beginning on or about April 30, 2010, oil made landfall along the Gulf Coast on white sand beaches, leased and privately owned subsurface areas, and in ecologically sensitive marshes and estuaries.  Underwater, immense plumes of oil and dispersant chemicals swirled through the entire water column, damaging ecosystems throughout the Gulf of Mexico.

69.    The oil spewed from the well for twelve weeks until BP finally capped the well on July 15, 2010.  Ultimately, almost five million barrels (210 million gallons) of crude oil spilled in the Gulf of Mexico.

70.    The crude oil carried with it significant public health risks.  Crude oil has many highly toxic chemical ingredients that can damage every system in the body.

71.    Crude oil contains benzene and other volatile organic compounds ("VOCs") such as ethylbenzene, toluene, xylene and napththalene, polycyclic aromatic hydrocarbons ("PAHs"), diesel fumes and heavy metals such as aluminum, cadmium, nickel, lead and zonc, all of which can harm human health.

72.    Chemicals such as benzene, PAHs and many other chemicals in crude oil are toxic and volatile, moving from the oil to the air.  Once airborne, they can blow over the ocean for miles, reaching communities far from the spill.  They may be noticed as petroleum odors.

73.    Dermal exposure to certain VOCs in crude oil can cause, *inter alia*, redness, swelling, irritation, rashes and blisters on the skin and mucous membranes.  Inhalation exposure to certain VOCs in crude oil can cause, *inter alia*, coughing, throat irritation, congestion,

shortness of breath and wheezing. Inhalation exposure to other OVCs in crude oil can also affect, *inter alia*, the nervous system causing, among other things, nausea, vomiting, dizziness, irritability, confusion, and weakness of extremities.  Ingestion of food or water containing VOCs from crude oil can cause, *inter alia*, nausea, vomiting and diarrhea.

74.     According to the Agency for Toxic Substances and Disease Registry ("ASTDR"), which is part of the U.S. Department of Health and Human Services, benzene is a known mutagen and carcinogen.  Benzene in crude oil can cause a variety of health complications, including ventricular fibrillation, congestive gastritis, toxic gastritis, pyloric stenosis, myalgia, kidney damage, skin irritation and burns, swelling and edema, vascular congestion in the brain and lethal central nervous system depression.

75.     A 2007 Centers for Disease Control review of benzene toxicity concluded that there is substantial evidence that benzene causes leukemia, aplastic anemia (precursor of leukemia), chromosomal abnormalities in lymphocyctes and bone marrow cells, damage to the immune system, and abnormal development of blood cells.  Long-term low-level oral and inhalation exposures to benzene have also caused peripheral nervous system abnormalities, distal neuropathy, difficulty sleeping and memory loss.

76.     As noted by Dr. Lisa Kaplowitz of the U.S. Department of Health and Human Services in her June 15, 2010 testimony before Congress: "Oil can remain toxic in the environment for years."

77.     The Oil Pollution Act, 33 U.S.C. §2717 ("OPA") imposes liability upon a "responsible party for a …facility from which oil is discharged …into or upon navigable waters or adjoining shorelines" for the damages that result from such incident as well as removal costs. 33 U.S.C. §2702.

78.    The U.S. Coast Guard is responsible for implementing many aspects of the OPA, including designating responsible parties, as well as responding to oil spills and supervising and/or coordinating response actions.

79.    After the Oil Spill, the Coast Guard formally and/or informally designated, *inter alia*, Defendants BP Exploration and Transocean Holdings as "responsible parties" under the OPA.

80.    In the wake of the disaster, and pursuant to its duties as a responsible party under the OPA, BP began implementing a program to attempt to prevent the gushing oil from reaching the shores of the Gulf States.  This disaster response plan had three primary components: offshore containment; shoreline protection; and subsea response.

81.    As part of its offshore containment response program, BP directed the use of vessels to, *inter alia*, recover coming to the surface of the Gulf of Mexico; skim oil from the surface of the water; and conduct *in-situ* burning of oil that reached the surface of the water.  BP also employed vessels to tow and deploy booms – floating barriers intended to contain, deflect, or hold back oil floating in the water's surface.

82.    In addition, BP's response plan included the use of chemical dispersants that were intended to break down the oil into finely dispersed droplets.

83.    Dispersants generally contain a solvent, a surfactant and other additives that break up the surface tension of an oil slick or sheen to make the oil more soluble in water.

84.    Among other dispersants, BP applied a highly toxic form of chemical dispersant called Corexit.  BP used both Corexit®9500 and Corexit®EC9527A.

85.    The Material Safety Data Sheet ("Data Sheet") – a form that sets forth the properties of a particular substance, including its toxicity and health effects – for Corexit®9500

indicates that it contains hazardous substances, that it is harmful to human health, and that dermal exposure, inhalation and ingestion should be avoided. The Data Sheet further states that Corexit® 9500 is an eye and skin irritant and may irritate the respiratory tract if inhaled. If ingested, it may cause chemical pneumonia.

86.     The Data Sheet for Corexit ® EC9527A also indicates that it contains hazardous substances, it is harmful to human health, and that dermal exposure, inhalation and ingestion should be avoided. The Data Sheet further states that Corexit® EC9527A is an eye and skin irritant and, if inhaled, may irritate the respiratory tract. If ingested, it may cause liver and kidney effects and/or damage, or irritate the gastrointestinal tract. Acute exposure may cause adverse central nervous system effects, nausea, vomiting, anesthetic or narcotic effects.

87.     In addition, Corexit ® EC9527A contains 2-butoxyethanol, also known as EGBE. Repeated or excessive exposure to EGBE may cause injury to red blood cells, the kidneys, and the liver. EGBE may be carcinogenic to humans. It is an eye, nose, and throat irritant. It can cause nausea, vomiting, diarrhea, and abdominal pain. Exposure to EGBE can also cause headaches, dizziness, lightheadedness and unconsciousness. Exposure to EGBE can damage a developing fetus, and chronic exposure may result in damage to male and female reproductive systems in animals.

88.     Both of these Corexit® products also contain non-specified organic sulfonic acid salt, which is "moderately toxic," as well as propylene glycol, a chemical with solvent properties. Propylene glycol is an irritant and exposure to high levels of propylene glycol and mists containing this chemical can cause eye, nose, throat and lung irritation. Some individuals are allergic to propylene glycol and those with eczema may be at higher risk. Exposure may cause erythema, edema, induration, and other skin problems.

89.     Upon information and belief, BP also authorized the application of other chemical dispersants, including PES51™ and OMI-500®, to near-shore and on-shore areas, as well as to contaminated vessels and containment equipment, to disperse the oil and clean vessels and equipment.

90.     The Data Sheet for PES51™ indicates that it should be handled with gloves, that it is an irritant, and that dermal exposure and ingestion should be avoided.

91.     The Data Sheet for OMI-500® indicates that it is harmful to human health and that dermal exposure, inhalation, and ingestion should be avoided.  Among other effects, OMI-500® can be irritating to skin and eyes and may cause irritation of the respiratory tract, typically experienced as nasal discomfort and discharge, possibly with chest pain and coughing. Headache, nausea, vomiting, dizziness, and drowsiness may occur.  Exposure may also cause mild to severe irritation experienced as discomfort or pain, excess blinking and tear production, possibly with marked redness and swelling of the conjunctiva.

92.     In summary, the dispersants used by BP are known to cause, *inter alia*, headaches; nausea; vomiting; diarrhea; abdominal pains; dizziness; chest pains and tightness; irritation of the skin, eyes, nose, throat and lung; breathing difficulties and respiratory system damage; asthma attacks; hypertension; damage to the liver and kidneys; central nervous system depression; neurotoxic effects; damage to red blood cells; genetic damage and mutations; reproductive and developmental damage; immune system damage; cardiac arrhythmia; cardiovascular damage; and increased severity of chronic obstructive pulmonary disease.

93.     Upon information and belief, immediately after the Deepwater Horizon disaster, on or about April 23, 2010, BP began subsea and aerial application of chemical dispersants to the resulting oil slick and sheens on the surface of the Gulf.  Chemical dispersants have been sprayed

onto the ocean surface from aircraft that fly over spills and dispense the chemicals from cargo holds, sprayed onto the ocean surface from fountain-type jets on the docks of boats, sprayed from smaller vessels onto the surface of the water, injected immediately below the surface of the water from vessels, injected deep below the surface of the ocean, and sprayed by hand.

94.    BP coordinated and directed aircraft owned and/or operated by others to fly out over the Gulf to spot oil slicks and to spray chemical dispersants on the surface of the Gulf.

95.    According to the Aerial Dispersants Operations -- Houma Status Report, as of June 26, 2010, BP made use of at least 10 spray aircraft and 8 spotter aircraft. At least four spray planes left from Houma, Louisiana. At least six spray planes left from Stennis International Airport in Mississippi. Upon information and belief, aerial dispersant sorties also would leave from airfields in the Gulf of Mexico and were conducted and orchestrated by BP.

96.    On or about May 19, 2010, the U.S. Environmental Protection Agency ("EPA") Administrator directed BP to identify and begin using chemical dispersants less toxic than Corexit®.

97.    In addition to the oil that was released by BP's Macondo well, BP directed over two million gallons of chemical dispersants to be sprayed, injected or otherwise released into Gulf waters. BP had injected at least 770,000 gallons of chemical dispersants directly into the damaged wellhead and otherwise directed its contractors to apply considerable amounts of chemical dispersants directly into the Gulf of Mexico.

98.    On or about May 19, 2010, the U.S. Environmental Protection Agency (EPA) Administrator directed BP within 24 hours of issuance to identify and to change to chemical dispersants that are less toxic than those dispersants that BP had been using, including Corexit®. BP refused to comply and continued using dispersants of its choice.

99.     On May 20, 2010, BP objected to this order and notified the EPA that it would continue using Corexit®.

100.     BP's use of chemical dispersants then skyrocketed: on May 22, 2010, BP used 45,000 gallons of dispersant and on May 23, 2010, it used 70,000 gallons of dispersant.

101.     Upon information and belief, BP stopped using Nalco's Corexit® 9527 on May 23, 2010, when supplies allegedly ran out.  It relied on Corexit® 9500 thereafter.

102.     On May 26, 2010, the EPA directed BP to reduce the overall use of Corexit® by 75% and to stop using chemical dispersants on the water's surface except in rare cases where an exemption was sought in writing from and approved by the On Site Coordinator.

103.     BP thereafter sought more than 40 exemption requests to use chemical dispersants on the surface of the Gulf of Mexico.  According to the Aerial Dispersants Operations -- Houma Status Report, by June 26, 2010, BP had applied 933,023 gallons of dispersant by aerial application.  As of the same date, BP had ordered application of dispersant by 386 flights, or sorties, and had covered approximately 291 square miles of the Gulf with dispersant.

104.     To date, BP and its contractors have used more than 1.8 million gallons of chemical dispersants in the Gulf of Mexico.

105.     Defendant BP recklessly, willfully and/or wantonly failed to use ordinary care by electing to use chemical dispersants that are more toxic than others in the response efforts and thereby amplified the toxic effects on and damages of cleanup workers, tourists, and residents including the Plaintiff named herein.

## **DEFENDANTS' KNOWLEDGE OF THE RISKS**

106.     At all times relevant to this litigation, Defendants knew or should have known that:

a)      Crude oil contains chemicals hazardous to human health and to the environment and ecosystems;

b)      chemical dispersants contain chemicals hazardous to human health and to the environment and ecosystems;

c)      Plaintiff should have been adequately and timely warned of the harmful effects of crude oil and chemical dispersants, and the hazardous substances which they contain, which are being released into the environment; and

d)      Plaintiff should have been provided with proper protective clothing and respirators.

### Factual Allegations Regarding Coastal Resident Chris Albert Martin

107.    In the wake of the disaster, BP began implementing a program to attempt to prevent the gushing oil from reaching the shores of the Gulf States. This disaster response plan had three primary components: subsea response; offshore containment; and shoreline protection.

108.    BP's response to its self-created disaster included the use of chemical dispersants that were intended to break down the oil into finely dispersed droplets. Dispersants generally contain a solvent, a surfactant and other additives that break up the surface tension of an oil slick or sheen to make the oil more soluble in water.

109.    Chemical dispersants have been sprayed onto the ocean surface from aircraft that fly over spills and dispense the chemicals from cargo holds, sprayed onto the ocean surface from fountain-type jets on the decks of boats, sprayed from smaller vessels onto the surface of the water, injected immediately below the surface of the water from vessels, injected deep below the surface of the ocean, and sprayed by hand.

110.    BP and its contractors have used more than 1.8 million gallons of chemical dispersants in the Gulf of Mexico in connection with the Oil Spill.

111.    Tarballs, tar-mats and oil slicks containing crude oil and chemical dispersants reached beaches, waterways, marshes, and bays where Plaintiff, CHRIS ALBERT MARTIN, was living. Based upon information and belief, Plaintiffs were exposed to crude oil and chemical dispersants in their environment through recreational activities in the Gulf of Mexico.

112.    Based upon information and belief, Plaintiff, CHRIS ALBERT MARTIN, was also exposed to fumes from the oil spill and oil spill response activities – including fumes from BP's burning of oil slicks as a response measure.

113.    Plaintiff, CHRIS ALBERT MARTIN, due to the proximity of his home to the Gulf of Mexico, and the actions and omission by Defendants, has been exposed to oil, dispersants, and other harmful chemicals.

114.    Plaintiff, CHRIS ALBERT MARTIN, lives and/or works in close proximity to areas that are the subject of Defendants' remedial activities. Due to his physical location, Plaintiff, CHRIS ALBERT MARTIN, was subjected to fumes and odors from the oil and dispersants.

115.    Exposure to chemicals in crude oil and chemical dispersants can cause a wide range of health problems. Crude oil has many highly toxic chemical ingredients that can damage every system in the body. Dispersant chemicals can affect many of the same organs. These include: respiratory system, nervous system (including the brain), liver, reproductive/urogenital system, kidneys, endocrine system, circulatory system, gastrointestinal system, immune system, sensory systems, musculoskeletal system, hematopoietic system (blood forming), skin and integumentary system and disruption of normal metabolism.

116.    Damage to these systems can cause a wide range of diseases and conditions. Some of these diseases and conditions may be immediately evident, and others can appear months or years later. The chemicals can impair normal growth and development through a variety of mechanisms, including endocrine disruption and direct fetal damage. They can cause mutations that may lead to

cancer and multi-generational birth defects. Some of the chemicals are known carcinogens, such as benzene.

117.    Many of the chemicals in crude oil and the dispersants target the same organs in the human body, and this increases the risk and may also increase the severity of harm. In addition, the dispersants currently used can increase the uptake (dose) of crude oil chemicals and movement of chemicals into critical organs.

## DAMAGES AND OTHER RELIEF REQUESTED

118.    As a result of Defendants' acts or omissions, Plaintiff has suffered the following physical injury damages:

a)    Exposure to chemicals in crude oil that have caused , or will likely cause, adverse health  effects;

b)    Exposure to chemicals in weathered crude that have caused, or will cause, adverse health effects;

c)    Exposure to chemicals in dispersants that have caused, or will likely cause, adverse health effects;

d)    Exposure to chemicals in oil and dispersant mixtures that have caused, or will likely cause, adverse health effects; and

e)    Costs incurred and inconvenience sustained by obtaining medical treatment for exposure to chemicals in the past and in the future.

119.    Plaintiff has suffered a discernible physical injury from exposure to oil, dispersants, and/or oil and dispersant mixtures.

120.    Plaintiff also demand injunctive and equitable relief and further, that Defendants be ordered to provide continued environmental, water supply, food supply, and air monitoring

for Plaintiff.

121.    As a result of Defendants' acts or omissions, Plaintiff has suffered emotional distress caused by concern over exposure to chemicals and their physical health effects.

## CAUSES OF ACTION

### COUNT I

### NEGLIGENCE, GROSS NEGLIGENCE AND WILLFUL MISCONDUCT AGAINST BP UNDER GENERAL MARITIME LAW

122.    Plaintiffs reallege paragraphs 1 through 121 as if fully set forth herein and further state:

123.    BP owed and breached duties of reasonable care to ensure the safety of their operations and guard against and prevent the risk of a blowout an oil spill and its effects in the Gulf of Mexico and the coastal regions.

124.    BP owed and breached duties of ordinary and reasonable care with respect to the design and manufacture of the BOP and float collar used on the Macondo well.

125.    BP was injecting its dispersants at the wellhead and breached a duty of ordinary and reasonable care with respect to the design, manufacture and use of the chemical dispersants.

126.    At all times BP controlled and directed the response and recovery efforts and failed to exercise reasonable care in the operation, design, implementation and execution of the response efforts, including the injection of dispersants at the wellhead.  Additionally, as the chemicals entered Gulf of Mexico territorial waters, BP owed a duty, and failed the duty, to exercise reasonable care in response efforts, including timely mitigating of the damage caused and stopping the spread of the oil onto and around Gulf of Mexico waters, shores and properties and where plaintiffs were working, living and swimming.

127.    Defendant BP recklessly, willfully and/or wantonly failed to use reasonably safe chemical dispersants in reasonably safe locations and quantities in response efforts and thereby exacerbated the contamination in the Gulf of Mexico and resulting injury to Plaintiffs.

128.    The incidents described above that caused damage to Plaintiffs were a proximate result of the negligence, fault, gross negligence, and/or willful misconduct of BP through their agents, servants, employees, contractors and other persons or entities for whose conduct Defendant is responsible, which are more particularly described as follows:

a)    Failing to operate the Deepwater Horizon in a safe manner;

b)    Operating the Deepwater Horizon in such a manner that a fire and explosion occurred onboard, causing it to sink and resulting in an oil spill;

c)    Failing to properly inspect the Deepwater Horizon to assure that its equipment and personnel were fit for their intended purpose;

d)    Failing to promulgate, implement, and enforce rules and regulations pertaining to the safe operations of the Deepwater Horizon, which, if they had been promulgated, implemented, and enforced, would have averted the fire, explosion, sinking, and oil spill;

e)    Failing to adhere to applicable safety, construction, and/or operating regulations, including, but not limited to, regulations designed to prevent the fire, explosion, and discharge of oil;

f)    Failing to properly design and/or engineer the well, drilling program, cementing program, mud program and completion program;

g)    Failing to take appropriate action to avoid or mitigate the accident;

h)    Negligent implementation of policies and procedures to safely conduct offshore operations in the Gulf of Mexico;

i)      Failing to properly train their employees;

j)      Failing to ascertain that the Deepwater Horizon and its equipment were free from defects and/or in proper working order;

k)      Failing to timely warn;

l)      Failing to provide all reasonable cooperation and assistance requested by the responsible officials in connection with the clean-up and removal activities;

m)      Failing to ensure that adequate plans, equipment, safeguards, resources and technology were readily available to prevent and/or mitigate the effects of the loss of control of a well and unfettered discharge of oil into the Gulf of Mexico;

n)      Failing to timely bring the oil release under control, to prevent the spill from migrating throughout the Gulf of Mexico;

o)      Failing to provide appropriate accident prevention equipment;

p)      Failing to ensure that the casing and float collar were properly designed and installed;

q)      Providing BOP's that failed to properly function;

r)      Failing to ensure that BOP's would work as intended;

s)      Failing to test the BOP's to ensure that they would operate properly;

t)      Recklessly altering the BOP's and failing to use them in a safe manner;

u)      Failing to conduct well cementing operations properly;

v)      Failing to employ alternative cementing operations in light of known problems with the actual cementing operations employed;

w)      Failing to have a reasonably adequate well control plan and necessary equipment in case of a loss of the well;

x)      Failing to exercise reasonable care in the design and implementation of both well control efforts and response and recovery efforts;

y)      Failing to insure that adequate plans, equipment, safeguards resources, and technology were available to prevent or mitigate the quantity of hazardous chemicals that would enter into and effect Gulf of Mexico territorial waters and Gulf Coast Region real property.

z)      Recklessly using dispersants so as to cause the greatest migration and widest potential for environmental toxic exposures and effects throughout the Gulf including Gulf Coast Region territorial waters and real property.

aa)     Failing to close or failing to advise local authorities to close beaches and Gulf waters where Plaintiff swam and participated in recreational activities.

bb)     Failing to post warnings at beaches and adjacent to Gulf coast waters regarding the dangers of swimming or participating in recreational activities in or around the Gulf of Mexico at the time of the Oil Spill disaster.

cc)     Failing to adequately monitor the air and Gulf water in Plaintiffs' vicinity for the presence of chemical dispersants and crude oil.

dd)     Failing to provide warnings to local hotels and lodging facilities regarding the potential negative health effects of swimming of in the Gulf of Mexico.

129.    Defendant BP was aware at all times relevant hereto that their operations and the acts and/or omissions described above created an unreasonable risk of harm and knew that catastrophic environmental destruction and economic loss would occur if the well being serviced by the DEEPWATER HORIZON were to blow out.

130.    Defendant BP was indifferent to this risk of harm.  Defendant BP intentionally failed to perform the duties owed to Plaintiffs in reckless disregard of the consequences their actions and/or omissions would have on Plaintiffs.

131.    Moreover, Defendant BP acted intentionally with knowledge that their acts would probably result in injury or in such a way as to allow an inference of a reckless disregard of the probable consequences of their acts.  Therefore, Defendants are also liable to Plaintiffs for gross negligence and/or willful misconduct.

132.    Plaintiffs have suffered and will continue to suffer significant economic damages and loss of business due to the impacts and the stigma caused by the impacts, on the marine environment, fish and shellfish populations, as well as to the Gulf waters from the oil spill disaster and related response efforts.

133.    The oil spill and subsequent response and recovery efforts that have caused damage and continue to cause damage to Plaintiffs was proximately caused by Defendants' negligence, gross negligence and/or willful misconduct.

134.    Further, upon information and belief, the oil spill was proximately caused by the Defendant BP's violation of applicable federal safety, construction, or operating regulations and/or by violations of such regulations by an agent or employee of the Defendant and/or a person acting pursuant to a contractual relationship with Defendant.

135.    Defendant BP had a duty to conform their conduct in such a manner as to assure that a blowout would not occur, that the Deepwater Horizon would not be destroyed and sink, that an uncontrolled oil spill would not result and that adequate well control and response measures would exist in case of emergency pursuant to federal and State law.

136.    Defendant BP failed to conform their conduct to the appropriate legal standard, thereby breaching their duty to assure that a blowout would not occur, that the Deepwater Horizon would not be destroyed and sink, that an uncontrolled oil spill would not result and that adequate well control and response measures would exist and be properly implemented in case of emergency pursuant to federal and State law.

137.    Defendant's substandard conduct in failing to prevent the blowout, the ensuing destruction and sinking of the Deepwater Horizon, and the uncontrolled discharge of oil from the Macondo well into the Gulf of Mexico pursuant to federal and State law was the cause-in-fact of the injuries, harm, and damages suffered by the Plaintiffs.

138.    Defendant's substandard conduct in failing to prevent and/or contain the blowout that resulted in the sinking of the Deepwater Horizon and the subsequent oil spill from the Macondo well was the legal cause of the Plaintiffs' injuries, harm, and damage.

139.    In addition, and/or in the alternative, the blowout, fire, explosion, destruction of the Deepwater Horizon and ensuing oil spill were caused by defective equipment and would have been prevented by non-defective equipment, including the BOP and float collar, which were in the care, custody, and control of the Defendant and over which the Defendants had *garde*. Defendants knew or should have known of these defects and Defendant is are therefore liable for the defects.

140.    BP has taken responsibility for the oil spill and cleaning up the oil spill, as former BP Chief Executive, Tony Hayward, had issued a statement on the BP website that BP is "… taking full responsibility for the spill and we will clean it up." BP has therefore admitted its liability for the oil spill.

141.    BP's duties are non-delegable.

142.   It was foreseeable that the Defendant's actions and/or omissions, resulting in the blowout of the Macondo well, the sinking and destruction of the Deepwater horizon, and the ensuing uncontrolled oil spill from the Macondo well, would proximately cause the damage, injury, and harm that Plaintiff did suffer and will continue to suffer, as alleged herein.

143.   The injuries to the Plaintiffs were also caused by or aggravated by the fact that Defendant failed to take reasonably necessary actions to mitigate the dangers associated with their operations.

144.   As a direct and proximate result of the Defendant's negligence and gross negligence, Plaintiff has suffered and will continue to suffer significant physical, economic and other damages in excess of $75,000.00 and are entitled to recover monetary damages.

145.   The existence and breach of Defendant's legal duties are established under general maritime law.

146.   At all times material hereto, Defendant owed duties of ordinary and reasonable care to Plaintiffs in connection with the drilling operations and maintenance of the Deepwater Horizon, including its appurtenances and equipment. BP additionally owed duties to guard against and/or prevent the risk of an oil spill and to mitigate the harm if an oil spill did occur.

147.   Further, BP owed a duty to Plaintiff to exercise due care in the operation, maintenance, handling, design, implementation and execution of the relief and recovery measures.

148.   BP had a heightened duty of care to Plaintiff because of the great danger associated with exposure to oil, dispersants, and/or other hazardous chemicals.

149.   At all times relevant to this litigation, BP and the other defendants knew or should have known that: (a) crude oil contains chemicals hazardous to human health; (b) chemical

dispersants contain chemicals hazardous to human health; (c) Plaintiff was entitled to adequate and timely warning of the harmful effects of exposure to crude oil and chemical dispersants and the hazardous substances that crude oil and dispersants contain; and (d) failure to exercise reasonable care in the operation, maintenance, handling, design, implementation and execution of the relief and recovery measures would result in harm to Plaintiff.

150.    BP breached its duty of care to the Plaintiff in the following non-exclusive respects:

a)    failing to prevent the explosion on board the Deepwater Horizon;

b)    failing to cap the Macondo well in a timely manner;

c)    failing to warn Plaintiffs, public officials, and government agencies of the harmful effects of crude oil, chemical dispersants and any mixture thereof, and the hazardous chemicals they contain;

d)    failing to conform to the provisions of the National Contingency Plan relating to the use of aerial chemical dispersants in the proximity of vessels and shallow waters;

e)    failing to otherwise exercise reasonable care in the operation, maintenance, handling, design, implementation and execution of the relief and recovery measures;

f)    failing to operate the Deepwater Horizon in a safe manner;

g)    operating the Deepwater Horizon in such a manner that a fire and explosion occurred onboard, causing it to sink and resulting in an oil spill;

h)    failing to properly inspect the Deepwater Horizon to assure that its equipment and personnel were fit for their intended purpose;

i)      failing to promulgate, implement, and enforce rules and regulations pertaining to the safe operations of the Deepwater Horizon, which, if they had been promulgated, implemented, and enforced, would have averted the fire, explosion, sinking, and oil spill;

j)      failing to adhere to applicable safety, construction, and/or operating regulations, including, but not limited to, regulations designed to prevent the fire, explosion, and discharge of oil;

k)      failing to properly design and/or engineer the well, drilling program, cementing program, mud program and completion program;

l)      failing to take appropriate action to avoid or mitigate the accident;

m)      negligent implementation of policies and procedures to safely conduct offshore operations in the Gulf of Mexico;

n)      failing to properly train their employees;

o)      failing to ascertain that the Deepwater Horizon and its equipment were free from defects and/or in proper working order;

p)      failing to timely warn**;**

q)      failing to provide all reasonable cooperation and assistance requested by the responsible officials in connection with the clean-up and removal activities;

r)      failing to ensure that adequate plans, equipment, safeguards, resources and technology were readily available to prevent and/or mitigate the effects of the loss of control of a well and unfettered discharge of oil into the Gulf of Mexico;

s)      failing to timely bring the oil release under control, to prevent the spill from migrating throughout the Gulf of Mexico;

t)      failing to provide appropriate accident prevention equipment;

u)    failing to ensure that the casing and float collar were properly designed and installed; providing BOP's that failed to properly function;

v)    failing to ensure that BOP's would work as intended;

w)    failing to test the BOP's to ensure that they would operate properly;

x)    recklessly altering the BOP's and failing to use them in a safe manner;

y)    failing to conduct well cementing operations properly;

z)    failing to employ alternative cementing operations in light of known problems with the actual cementing operations employed;

aa)    failing to have a reasonably adequate well control plan and necessary equipment in case of a loss of the well;

bb)    failing to exercise reasonable care in the design and implementation of both well control efforts and response and recovery efforts;

cc)    failing to insure that adequate plans, equipment, safeguards resources, and technology were available to prevent or mitigate the quantity of hazardous chemicals that would enter into and effect the Gulf of Mexico.

dd)    recklessly using dispersants so as to cause the greatest migration and widest potential for environmental toxic exposures and effects throughout the Gulf.

151.    The blowout and explosions on the Deepwater Horizon, its sinking and the resulting spill were caused by the joint and concurrent negligence of the BP Defendants and the Transocean and/or Halliburton Defendants named herein.

152.    Defendant BP's breach of its duties posed an unreasonable risk of harm to Plaintiffs.

153.     As a direct and proximate result of the negligence of the Defendant BP, the Plaintiff suffered bodily injury and resulting pain and suffering, disability and disfigurement, mental anguish, loss of the capacity for the enjoyment of life, expense of hospitalization, medical and nursing care and treatment, loss of earnings, loss of ability to earn money, and aggravation of a pre-existing condition.   These losses are either permanent or continuing in nature and Plaintiff will continue to suffer these losses in the future.   Plaintiff's physical injuries required medical care in the past and will likely require on going care in the future. The Defendants are liable jointly and severally for Plaintiff's damages resulting from Defendants' negligence and gross negligence**.**  As a result of Defendants' gross negligence, Plaintiffs are also entitled to punitive damages.

WHEREFORE, the Plaintiffs, demand judgment for damages against the Defendant BP, together with pre-judgment interest, costs and demands trial by jury of all issues so triable as of right by jury.

## COUNT II

### NEGLIGENCE UNDER GENERAL MARITIME LAW
### (Against All Defendants)

154.     Plaintiffs reallege paragraphs 1 through 121 as if fully set forth herein  and further state:

155.     At all times material hereto, Defendants were participating in drilling operations onboard the Deepwater Horizon in the Gulf of Mexico.

156.     At all times material hereto, Defendants owed and breached duties of ordinary and reasonable care to Plaintiffs in connection with the drilling operations of the Deepwater Horizon and the maintenance of the vessel, its appurtenances and equipment, and additionally owed and breached duties to Plaintiffs to guard against and/or prevent the risk of an oil spill.

157.    The existence and breach of these legal duties are established under the general maritime law and state law as deemed applicable herein.

158.    The blowout and explosions on the Deepwater Horizon, its sinking and the resulting Spill were caused by the joint and concurrent negligence of Defendants which renders them jointly, severally, and solidarily liable to Plaintiffs.

159.    Defendants knew of the dangers associated with deep water drilling and failed to take appropriate measures to prevent damage to Plaintiffs and the Gulf of Mexico's marine and coastal environments and estuarine areas.

160.    Defendants were under a duty to exercise reasonable care while participating in drilling operations on the Deepwater Horizon to ensure that a blowout and subsequent oil spill did not occur as a result of such operations.

161.    Defendants were under a duty to exercise reasonable care to ensure that if crude oil discharged in the event of a blowout, that it would be contained and/or stopped within the immediate vicinity of the Deepwater Horizon in an expeditious manner.

162.    Defendants knew or should have known that the acts and omissions described herein could result in damage to Plaintiffs.

163.    Defendants, respectively and collectively, failed to exercise reasonable care while participating in drilling operations to ensure that a blowout and subsequent oil spill did not occur, and thereby breached duties owed to Plaintiffs.

164.    Defendants, respectively and collectively, failed to exercise reasonable care to ensure that oil would expeditiously and adequately be contained within the immediate vicinity of the Deepwater Horizon in the event of a blowout, and thereby breached duties owed to Plaintiffs.

165.    Defendants, respectively and collectively, failed to exercise reasonable care to ensure that adequate safeguards, protocols, procedures and resources would be readily available to prevent and/or mitigate the effects an uncontrolled oil spill into the waters of the Gulf of Mexico, and thereby breached duties owed to Plaintiffs.

166.    The conduct of the Defendants with regard to the manufacture, maintenance and/or operation of drilling operations and oil rigs such as the Deepwater Horizon and its appurtenances and equipment is governed by numerous state and federal laws and permits issued under the authority of these laws. These laws and permits create statutory standards that are intended to protect and benefit Plaintiffs. One or more of the Defendants violated these statutory standards.

167.    The violations of these statutory standards constitute negligence per se under Louisiana, Texas, Mississippi, Alabama, Florida, and the general maritime law.

168.    At all times material hereto the Deepwater Horizon was owned, navigated, manned, possessed, managed, and controlled by TRANSOCEAN.

169.    As the owner and manager of the Deepwater Horizon, TRANSOCEAN owed duties of care to Plaintiffs to, *inter alia*, man, possess, manage, control, navigate, maintain and operate the Deepwater Horizon with reasonable and ordinary care.

170.    TRANSOCEAN breached its duties to Plaintiffs by, *inter alia*, failing to properly manage, control, maintain and operate the Deepwater Horizon and its safety equipment, including the gas sensors, air intake valves, emergency shutdown systems, and BOP, and in disabling vital alarm systems on the Deepwater Horizon before the blowout.

171.    TRANSOCEAN also breached its duties to Plaintiffs by making and/or acquiescing to a series of reckless decisions concerning, *inter alia*, well design, the use of

centralizers, mudding operations, cementing, integrity testing, deployment of the casing hanger lockdown sleeve, spacer material, and simultaneous operations causing worker confusion and loss of focus.

172.    Defendants also violated the International Safety and Management Code ("ISM"), as adopted by the International Convention for the Safety at Life at Sea ("SOLAS"), which provides rules and standards to ensure that ships are constructed, equipped, and manned to safeguard life at sea, by failing to properly maintain the vessel, train personnel, and perform appropriate risk assessment analyses. *See* 46 USC §§ 3201-3205 and 33 CFR §§ 96.230 and 96.250.

173.    At all times material hereto, the Deepwater Horizon was leased and operated pursuant to a contract between TRANSOCEAN and BP. Together, TRANSOCEAN and BP and Halliburton were responsible for design and well control.

174.    BP owed duties to Plaintiffs to, *inter alia*, exercise reasonable care to design, create, manage and control the well and the flow of hydrocarbons therefrom in a safe and prudent manner and to conduct its drilling operations with reasonable and ordinary care.

175.    BP breached its duties to Plaintiffs by, *inter alia*:

   a)    choosing and implementing a less expensive and less time-consuming long string well design, which had few barriers against a gas blowout, instead of a safer liner/tieback design which would have provided additional barriers to gas blowout, despite its knowledge that the liner/tieback design was a safer option;

   b)    using pipe material that it knew, and which it recognized before the blowout, might collapse under high pressure;

c)        using too few centralizers to ensure that the casing was centered into the wellbore;

d)        failing to implement a full "bottoms-up" circulation of mud between the running of the casing and the beginning of the cement job in violation of industry standards;

e)        failing to require comprehensive lab testing to ensure the density of the cement, and failing to heed the ominous results of negative pressure testing which indicated that the cement job was defective;

f)        cancelling the cement bond log test that would have determined the integrity of the cement job;

g)        failing to deploy the casing hanger lockdown sleeve to prevent the wellhead seal from being blown out by pressure from below;

h)        using an abnormally large quantity of mixed and untested spacer fluid;

i)        failing to train drilling vessel workers and/or onshore employees, and to hire personnel qualified in risk assessment and management of complex systems like that found on the Deepwater Horizon;

j)        requiring simultaneous operations in an effort to expedite the project, making it difficult for workers to track fluid volumes in the wellbore; and,

k)        causing property damage to the vessels involved in the clean-up and remediation program, and failing to properly administer and provide payment for work, time, and/or property damage to those entities and workers participating in the program.

176.    All of the foregoing acts and/or omissions by BP proximately caused and/or contributed to Plaintiff's injuries and damages.

177.    At all times material hereto, HALLIBURTON was responsible for cementing the well that was the subject of the Spill, and further was engaged in testing, analysis, and monitoring of the aforementioned well.

178.    At all times material hereto, HALLIBURTON owed duties to Plaintiffs to, *inter alia*, exercise reasonable care in conducting its cementing, testing, analysis and monitoring of the Deepwater Horizon's well.

179.    HALLIBURTON breached its duties to Plaintiffs by, *inter alia*, failing to exercise reasonable care in conducting its cementing, testing, analysis, and monitoring of the Deepwater Horizon's well. HALLIBURTON was negligent by, *inter alia*, failing to use a full "bottoms-up" circulation of mud between the running of the casing and the beginning of the cement job in violation of industry standards; failing to require comprehensive lab testing to ensure the density of the cement, and failing to heed the ominous results of negative pressure testing which indicated that the cement job was defective; cancelling, or acquiescing in the cancellation of, the cement bond log test that would have determined the integrity of the cement job; failing to deploy, or acquiescing in the decision not to deploy, the casing hanger lockdown sleeve to prevent the wellhead seal from being blown out by pressure from below, all of which proximately caused and/or contributed to Plaintiffs' injuries and damages.

180.    In addition to the negligent actions described herein, and in the alternative thereto, the injuries and damages suffered by Plaintiffs were caused by the acts and/or omissions of Defendants that are beyond proof by the Plaintiffs, but which were within the knowledge and control of the Defendants, there being no other possible conclusion than that the blowout, explosions, fire, sinking, and Spill resulted from the negligence of Defendants. The blowout, explosions, fire, sinking, and the resulting Spill would not have occurred had the Defendants

satisfied the duty of care imposed on them and Plaintiffs, therefore, plead the doctrine of *res ipsa loquitur*.

181.    In addition to the foregoing acts of negligence, Plaintiffs aver that the blowout, explosions, fire, and resulting Spill were caused by the joint, several, and solidary negligence and fault of Defendants in the following non-exclusive particulars:

a)      Failing to properly operate the Deepwater Horizon;

b)      Operating the Deepwater Horizon in such a manner that a fire and explosions occurred onboard, causing it to sink and resulting in the Spill;

c)      Failing to properly inspect the Deepwater Horizon to assure that its equipment and personnel were fit for their intended purpose;

d)      Acting in a careless and negligent manner without due regard for the safety of others;

e)      Failing to promulgate, implement and enforce rules and regulations pertaining to the safe operations of the Deepwater Horizon which, if they had been so promulgated, implemented and enforced, would have averted the blowout, explosions, fire, sinking, and Spill;

f)      Operating the Deepwater Horizon with untrained and unlicensed personnel;

g)      Negligently hiring, retaining and/or training personnel;

h)      Failing to take appropriate action to avoid or mitigate the accident;

i)      Negligently implementing or failing to implement policies and procedures to safely conduct offshore operations in the Gulf of Mexico;

j)    Failing to ascertain that the Deepwater Horizon and its equipment were free from defects and/or in proper working order;

k)    Failing to warn in a timely manner;

l)    Failing to timely bring the oil release under control;

m)    Failing to provide appropriate accident prevention equipment;

n)    Failing to observe and read gauges that would have indicated excessive pressures in the well;

o)    Failing to react to danger signs; and

p)    Such other acts of negligence and omissions as will be shown at the trial of this matter; all of which acts are in violation of the general maritime law.

182.    Plaintiff is entitled to a judgment finding Defendants liable, jointly, severally, and solidarily, to Plaintiff for damages suffered as a result of Defendants' negligence and awarding Plaintiff adequate compensation therefor in amounts determined by the trier of fact.

183.    The injuries to Plaintiff were also caused by and/or aggravated by the fact that Defendants failed to take necessary actions to mitigate the danger associated with their operations.

WHEREFORE, the Plaintiffs demand judgment for damages against the Defendants, together with pre-judgment interest, costs and demands trial by jury of all issues so triable as of right by jury.

### COUNT III
### GROSS NEGLIGENCE AND WILLFUL MISCONDUCT UNDER GENERAL MARITIME LAW
### (All Defendants)

184.    Plaintiffs reallege paragraphs 1 through 121 as if fully set forth herein and further state:

185.    Defendants owed and breached duties of ordinary and reasonable care to Plaintiffs in connection with the maintenance of, and drilling operation on, the Deepwater Horizon, and additionally owed and breached duties to Plaintiffs to guard against and/or prevent the risk of the Spill. The existence and breach of these legal duties are established under the general maritime law and state law as deemed applicable herein.

186.    Defendants breached their legal duty to Plaintiffs and failed to exercise reasonable care and acted with reckless, willful, and wanton disregard in the negligent manufacture, maintenance, and/or operation of the Deepwater Horizon.

187.    Defendants knew or should have known that their wanton, willful, and reckless misconduct would result in a disastrous blowout and oil spill, causing damage to those affected by the Spill.

188.    BP, TRANSOCEAN and HALLIBURTON acted with gross negligence, willful misconduct, and reckless disregard for human life and the safety and health of the environment and Plaintiffs by, *inter alia*, disabling the gas alarm system aboard the Deepwater Horizon.

189.    BP, TRANSOCEAN and HALLIBURTON acted with gross negligence, willful misconduct, and reckless disregard for human life and the safety and health of the environment and Plaintiffs by, *inter alia*, failing to use a sufficient number of "centralizers" to prevent channeling during the cement process; failing to run a bottoms up circulation of the drilling mud prior to beginning the cement job; disregarding proper drilling, casing, mudding, and cementing

procedures; failing to ensure that that adequate safeguards, protocols, procedures and resources would be readily available to prevent and/or mitigate the effects an uncontrolled oil spill into the waters of the Gulf of Mexico.

190.    BP, TRANSOCEAN, and HALLIBURTON acted with gross negligence, willful misconduct, and reckless disregard for human life and the safety and health of the environment and Plaintiffs by, *inter alia*, using an inappropriate cement mixture for the well; failing to appropriately test that cement mixture prior to using it in the well; failing to run a cement bond log to evaluate the integrity of the cement job; and failing to deploy the casing hanger lockdown sleeve prior to commencing the mud displacement process in the well.

191.    BP, TRANSOCEAN and HALLIBURTON acted with gross negligence, willful misconduct, and reckless disregard for human life and the safety and health of the environment and Plaintiffs by, *inter alia*, using an untested, abnormally large volume of mixed spacer solutions to avoid having to properly dispose of the two separate spacer substances as hazardous wastes.

192.    BP, TRANSOCEAN and HALLIBURTON acted with gross negligence, willful misconduct, and reckless disregard for human life and the safety and health of the environment and Plaintiffs by, *inter alia*, defectively designing, recklessly maintaining and altering, and/or wantonly operating and/or using the BOP appurtenant to the Deepwater Horizon.

193.    As a result of Defendants, BP, TRANSOCEAN and HALLIBURTON's gross negligence, willful misconduct, and reckless disregard, Plaintiffs are entitled to a judgment finding Defendants, BP, TRANSOCEAN and HALLIBURTON liable to Plaintiffs for damages suffered in an amount to be determined by the trier of fact, including but not limited to punitive damages.

WHEREFORE, the Plaintiffs, demand judgment for damages against the Defendants, together with pre-judgment interest, costs and demands trial by jury of all issues so triable as of right by jury.

**COUNT IV**
**MEDICAL MONITORING AS AN ELEMENT OF DAMAGES UNDER GENERAL MARITIME LAW**

194.    Plaintiffs reallege paragraphs 1 through 121 as if fully set forth herein and further state:

195.    Plaintiffs have been exposed to greater than normal background levels of the oil, dispersants, and/or other hazardous chemicals used for combating or resulting from the Oil Spill.

196.    The oil, dispersants, and/or other hazardous chemicals used for or resulting from the Oil Spill are proven hazardous, dangerous, or toxic substances, to which Plaintiff has been exposed.

197.    Plaintiff's exposure is likely to be causing serious health problems, diseases, and medical conditions that may be prevented by timely medical diagnosis and treatment.

198.    The method and means for diagnosing the Plaintiff's potential medical problems are well-accepted in the medical and scientific community and will be of great benefit to Plaintiff by preventing or minimizing health problems that Plaintiffs may encounter as a result of the Oil Spill and from dispersants used to attempt to clean the Oil Spill.

199.    As a proximate result of Plaintiff's exposure to oil, dispersants, and/or other hazardous chemicals used for or resulting from the Oil Spill, Plaintiff has developed a significantly increased risk of contracting a serious latent disease.

200.    Monitoring procedures exist that make the early detection of any latent disease possible that are different from those normally recommended in the absence of the exposure.

201.    The prescribed monitoring regime is reasonably necessary according to contemporary scientific principles.

202.    Plaintiff has required medical treatment as a result of injuries caused by exposure to oil and/or chemical dispersants and other hazardous chemicals used to combat or resulting from the Oil Spill and have not reached maximum medical improvement.

203.    Defendants have denied such payment and/or have paid benefits in an insufficient amount.

204.    As a result of Defendants failure to pay and/or delay in timely providing and/or paying the proper amount, Plaintiffs have suffered further injuries and damages.

205.    Defendants failure to provide benefits has been callous, willful, wanton, or otherwise tortuous, for which punitive damages are recoverable.

206.    Defendants are also liable for all reasonable and necessary attorney's fees and costs incurred on Plaintiffs' behalf in seeking to secure proper benefits from Defendants.

WHEREFORE, the Plaintiffs demand judgment for damages against the Defendants, together with pre-judgment interest, costs and demands trial by jury of all issues so triable as of right by jury.


## COUNT V
## FRAUDULENT CONCEALMENT
### (Against all Defendants)

207.    Plaintiffs reallege paragraphs 1 through 121 as if fully set forth herein and further state:

208.    To the extent available under state law, Plaintiffs are entitled to recovery against Defendants BP, HALLIBURTON and TRANSOCEAN for their fraudulent concealment of material facts concerning the Spill.

209.    After the explosions, Defendant BP attempted to downplay and conceal the severity of the Spill. BP's initial leak estimate of 1,000 barrels per day was found by government investigators to be a fraction of the actual leakage amount of 50,000 barrels of oil per day

210.    Moreover, in the aftermath of the explosions, BP did not provide complete and timely announcements and warnings about the severity, forecast and trajectory of the Spill.

211.    In addition, BP misrepresented its capabilities to respond to the Spill. BP overstated its ability to a handle a blowout in its Exploration Plan, wherein it claimed that in the event of a blowout resulting in an oil spill, it was "unlikely to have an impact based on the industry wide standards for using proven equipment and technology for such responses."

212.    In fact, BP did not have proven equipment and technology to respond to the Spill; instead, according to the letter to Attorney General Eric Holder by Members of Congress on May 17, 2010, it did not "in any way appear that there was 'proven equipment and technology' to respond to the spill, which could have tragic consequences for local economies and the natural resources of the Gulf of Mexico." As noted further in that letter, "much of the response and implementation of spill control technologies appear[ed] to be taking place on an ad hoc basis."

213.    BP admitted on May 10, 2010 that "[a]ll of the techniques being attempted or evaluated to contain the flow of oil on the seabed involve significant uncertainties because they have not been tested in these conditions before."

214.    Despite its inability to respond and control the Spill, BP resisted requests from scientists to use sophisticated instruments at the ocean floor that would have provided a more accurate picture of the amount of oil that was gushing from the well.

215.    BP did not in the aftermath of the blowout or since that time provide complete or timely announcements and warnings about the severity, forecast and trajectory of the Spill.

216.    The severity, forecast and trajectory of the Spill, and BP's ability to respond to the Spill, were material facts that BP had a duty to disclose.

217.    In addition, Defendant HALLIBURTON misrepresented and concealed the stability of the cement used at the Macondo well, despite having performed three tests before the Spill, all of which demonstrated that the foam cement used at Macondo was unstable.

218.    The instability of the cement used at the Macondo well and the results of the testing performed before the Spill were material facts that HALLIBURTON had a duty to disclose.

219.    Moreover, BP was aware, before the Spill, that HALLIBURTON's testing had revealed that the concrete foam was unstable, yet it concealed this material fact.

220.    For its part, TRANSOCEAN misrepresented and concealed the condition of the Deepwater Horizon and the known hazards associated with the disabling of, and/or failure to maintain, its safety features and appurtenances, including, *inter alia*, its BOP.

221.    TRANSOCEAN also misrepresented and concealed the safety record of the vessel, which was based on false data supplied by its personnel.

222.    TRANSOCEAN misrepresented and concealed the condition of many key components, including, *inter alia*, the BOP rams and failsafe valves, which had not been fully inspected for ten years before the blowout, and at least 36 components and systems on the vessel that were in "bad" or "poor" condition, and which it was aware might lead to loss of life, serious injury or environmental damage.

223.    The foregoing known hazards, poor condition, and maintenance and safety issues associated with the Deepwater Horizon and its appurtenances and equipment were material facts that TRANSOCEAN had a duty to disclose.

224.    Defendants, HALLIBURTON, BP, and TRANSOCEAN failed to disclose or concealed the foregoing material facts, and their failure to do so induced Plaintiffs to act or to refrain from acting to protect their property, businesses, livelihoods and income.

225.    As a direct and proximate result of the fraudulent concealment of the foregoing material facts by Halliburton, BP, and Transocean, Plaintiffs suffered damage to their businesses, livelihood, income and damage to and diminution in value of their property, for which they are entitled to compensation.

226.    Moreover, the acts of misrepresentation and concealment of the foregoing material facts by HALLIBURTON, BP, and TRANSOCEAN were willful, wanton, and/or in callous disregard for the safety of others and, accordingly, Plaintiffs are entitled to an award of punitive damages.

WHEREFORE, the Plaintiffs, demand judgment for damages against the Defendants, together with pre-judgment interest, costs and demands trial by jury of all issues so triable as of right by jury.

### COUNT VI
### NEGLIGENCE *PER SE*
### (Against All Defendants)

227.    Plaintiffs reallege paragraphs 1 through 121 as if fully set forth herein and further state:

228.    Defendants' conduct with regard to the manufacture, maintenance and/or operation of drilling operations and oil vessels such as the *Deepwater Horizon*, the release of hazardous and toxic chemicals into the environment, and the application of dispersants and other hazardous chemicals is governed by numerous state and federal laws and permits issued under

the authority of these laws. These laws and permits create statutory and regulatory standards that are intended to protect and benefit Plaintiffs, including, but not limited to, those set forth in Section 311 of the Clean Water Act, 40 C.F.R. § 300 App. E, 30 C.F.R. Part 254 and the Oil Pollution Act, 33 U.S.C. § 2717(b) (the "OPA").

229.    One or more of Defendants violated these statutory and/or regulatory standards.

230.    Defendants' violations of these statutory and/or regulatory standards constitute negligence *per se* under Louisiana, Texas, Mississippi, Alabama and Florida law.

231.    Defendants had actual and/or constructive knowledge of the facts and circumstances leading to and causing the incidents described herein which in turn caused Plaintiffs' injuries and their actions and inactions were grossly negligent, reckless, willful and/or wanton.

232.    As a direct and proximate cause of Defendants' violation of statutory and/or regulatory standards, Plaintiff has suffered physical injuries.  Plaintiffs are entitled to a judgment in their favor for damages suffered in an amount to be determined by the trier of fact, including, but not limited to, punitive damages.

WHEREFORE, the Plaintiffs demand judgment for damages against the Defendants, together with pre-judgment interest, costs and demands trial by jury of all issues so triable as of right by jury.

## COUNT VII
## NUISANCE
### (Against All Defendants)

233.    Plaintiffs reallege paragraphs 1 through 121 as if fully set forth herein and further state:

234.    As a result of the oil disaster**,** Plaintiff is constantly exposed to harmful chemicals in the air from oil, dispersants, and/or other harmful chemicals resulting from the Oil Spill at levels, amounts, and under conditions different from the general public.

235.    Moreover, Plaintiff was subjected to foul and harmful odors emanating from the crude oil soaked booms and/or the chemical dispersants.

236.    Plaintiff has no adequate remedy at law.

237.    There exists an imminent likelihood of irreparable harm if the injunction is not issued.

238.    The threatened harm to the Plaintiff outweighs any potential harm to Defendants.

239.    Granting the injunction does not contravene a substantial public interest.

240.    Plaintiffs are entitled to judgment finding Defendants liable to Plaintiffs for damages, including costs of future medical screening and monitoring, for the creation of a public nuisance and a judgment for injunctive relief to abate the nuisance.

WHEREFORE, the Plaintiffs demand judgment for damages against the Defendants, together with pre-judgment interest, costs and demands trial by jury of all issues so triable as of right by jury.

<div align="center">

**COUNT VIII**
**BATTERY**
**(Against All Defendants)**

</div>

241.    Plaintiffs reallege paragraphs 1 through 121 as if fully set forth herein and further state.

242.    Defendants intentionally sprayed, and/or directed spraying, chemical dispersants in the immediate vicinity of Plaintiff.

243.    Defendants' spraying of chemical dispersants in the immediate vicinity of Plaintiffs without warning or safety equipment has caused Plaintiff to be exposed to harmful chemicals and resulted in physical symptoms.

244.    Defendants spraying of chemical dispersants in the immediate vicinity of Plaintiffs without warning has caused Plaintiff to be exposed to harmful chemicals and resulted in physical exposure and harm.

245.    Plaintiffs are entitled to judgment finding Defendants liable to Plaintiffs for damages suffered as a result of subjecting Plaintiffs to unwanted, offensive conduct and enjoining Defendants' tortious conduct toward Plaintiffs.  Further, Plaintiffs are entitled to an award of Punitive Damages.

WHEREFORE, the Plaintiffs demand judgment for damages against the Defendants, together with pre-judgment interest, costs and demands trial by jury of all issues so triable as of right by jury.

## COUNT IX

## FLORIDA MEDICAL MONITORING CLAIM
### (Against All Defendants)

246.    Plaintiffs reallege paragraphs 1 through 121 as if fully set forth herein and further state:

247.    Plaintiff will suffer irreparable harm if the Court does not render the medical monitoring relief set forth herein, and if Defendants are not ordered to create, fund and support a medical monitoring program as set forth herein.

248.    Plaintiff demands injunctive and equitable relief and that Defendants be ordered to provide continued environmental, water supply, food supply, and air monitoring for Plaintiffs in Florida.

249.    Plaintiff has been exposed to greater than normal background levels of oil, dispersants, and/or other hazardous chemicals as a result of the Oil Spill.

250.    The oil, dispersants, and/or other hazardous chemicals used for or resulting from the Oil Spill are proven hazardous, dangerous, or toxic substances, to which Plaintiff has been exposed.

251.    Plaintiff's exposure wase caused by Defendants' negligence or otherwise tortious conduct.

252.    Plaintiff's exposure may lead to serious health problems, diseases, and medical conditions that may be prevented by timely medical diagnosis and treatment.

253.    The method and means for diagnosing Plaintiff's potential medical problems are well accepted in the medical and scientific community and will be of great benefit to Plaintiffs by preventing or minimizing health problems that Plaintiffs may encounter as a result of the Oil Spill and from dispersants used to attempt to clean the Oil Spill.

254.    As a proximate result of Plaintiff's exposure to oil, dispersants, and/or other hazardous chemicals which have been released from the Oil Spill, Plaintiffs have developed a significantly increased risk of contracting a serious latent disease.

255.    Monitoring procedures exist that make the early detection of any latent disease possible that are different from those normally recommended in the absence of the exposure.

256.    The prescribed monitoring regime is reasonably necessary according to contemporary scientific principles.

WHEREFORE, the Plaintiffs demand judgment for damages against the Defendants, together with pre-judgment interest, costs and demands trial by jury of all issues so triable as of right by jury.

## COUNT X
## LOSS OF CONSORTIUM CLAIM
### (Against All Defendants)

257.    Plaintiff realleges paragraphs 1 through 256 as if fully set forth herein and further states:

258.    At all times material hereto, the Plaintiff, JENNIFER MARTIN, was and is the lawful spouse of the Plaintiff, CHRIS MARTIN.

259.    As a direct and proximate result of the negligence of the Defendants, Plaintiff, JENNIFER MARTIN, has suffered and will continue to suffer the loss of her spouse's services, support, consortium and the care and comfort of his society.

WHEREFORE, the Plaintiffs demand judgment for damages against the Defendants, together with pre-judgment interest, costs and demands trial by jury of all issues so triable as of right by jury.

## COUNT XI
## PUNITIVE DAMAGES
### (Against all Defendants)

260.    Plaintiff realleges paragraphs 1 through 153 and 184 through 193 as if fully set forth herein and further states:

261.    Defendants focused primarily on profit while disregarding public and environmental health and safety while undertaking their ultra-hazardous activities on the *Deepwater Horizon*.

262.    Defendants, BP, TRANSOCEAN, and HALLIBURTON, engaged in conduct so reckless, willful, wanton and in such utter and flagrant disregard for the safety and health of the public and the environment in their activities leading up to and/or during the blowout, explosions, fire, and Spill, as alleged herein, that an award of punitive damages against them at the highest possible level is warranted and necessary to impose effective and optimal punishment and deterrence. Plaintiffs, society and the environment cannot afford and should never be exposed to the risks of another disaster of the magnitude caused by Defendants' misconduct herein.

263.    BP, TRANSOCEAN and HALLIBURTON focused primarily on profit while disregarding public and environmental health and safety while undertaking their ultra-hazardous activities on the Deepwater Horizon by performing a critical well pressure test with untrained and unqualified personnel and by callously ignoring and/or misinterpreting abnormal "red flag" pressure test results.

264.    BP's corporate culture caused and allowed it to disregard the lessons it should have learned and applied from previous incidents at its facilities that resulted in extensive damage and loss of live; instead, it continued to place others at risk in the interests of cost-cutting and financial gain.

265.    BP, TRANSOCEAN and HALLIBURTON callously and with reckless disregard for human life disabled the flammable gas alarm system aboard the Deepwater Horizon and prevented said system from operating properly and preventing or containing the explosions, fire and loss of life.

266.    BP, TRANSOCEAN and HALLIBURTON focused primarily on profit while disregarding public and environmental health and safety while undertaking their ultra-hazardous activities on the Deepwater Horizon by using a well design with too few barriers to gas flow.

267.    BP, TRANSOCEAN and HALLIBURTON focused primarily on profit while disregarding public and environmental health and safety while undertaking their ultra-hazardous activities on the Deepwater Horizon by failing to use a sufficient number of "centralizers" to prevent channeling during the cement process.

268.    BP, TRANSOCEAN and HALLIBURTON focused primarily on profit while disregarding public and environmental health and safety while undertaking their ultra-hazardous activities on the Deepwater Horizon by failing to run a bottoms up circulation of the drilling mud prior to beginning the cement job.

269.    BP, TRANSOCEAN and HALLIBURTON focused primarily on profit while disregarding public and environmental health and safety while undertaking their highly dangerous activities on the Deepwater Horizon by using an inappropriate cement mixture for the type of rock formation surrounding the well, and by failing to appropriately test that cement mixture prior to using it in the well.

270.    BP, TRANSOCEAN and HALLIBURTON focused primarily on profit while disregarding public and environmental health and safety while undertaking their highly dangerous activities on the Deepwater Horizon by failing to run a cement bond log to evaluate the integrity of the cement job.

271.    BP, TRANSOCEAN and HALLIBURTON focused primarily on profit while disregarding public and environmental health and safety while undertaking their highly

dangerous activities on the Deepwater Horizon by failing to deploy the casing hanger lockdown sleeve prior to commencing the mud displacement process in the well.

272.    BP, TRANSOCEAN and HALLIBURTON focused primarily on profit while disregarding public and environmental health and safety while undertaking their highly dangerous activities on the Deepwater Horizon by using an untested, abnormally large volume of mixed spacer solutions to avoid having to properly dispose of the two separate spacer substances as hazardous wastes.

273.    BP, TRANSOCEAN and HALLIBURTON focused primarily on profit while disregarding public and environmental health and safety while undertaking their highly dangerous activities on the Deepwater Horizon by ignoring and/or misinterpreting abnormal, "red flag" pressure test results.

274.    BP, TRANSOCEAN and HALLIBURTON recklessly, willfully and/or wantonly caused or contributed to the catastrophic Spill by their grossly inadequate maintenance, and reckless and improper operation and use of the BOPs appurtenant to the Deepwater Horizon.

275.    BP, TRANSOCEAN and HALLIBURTON recklessly, willfully and/or wantonly failed to ensure that oil would expeditiously and adequately be contained within the immediate vicinity of the Deepwater Horizon in the event of a blowout.

276.    BP, TRANSOCEAN and HALLIBURTON recklessly, willfully and/or wantonly caused or contributed to the catastrophic Spill through their collective and respective disregard for proper drilling, casing, mudding, and cementing procedures.

277.    BP, TRANSOCEAN and HALLIBURTON willfully and/or wantonly failed to ensure that that adequate safeguards, protocols, procedures and resources would be readily

available to prevent and/or mitigate the effects an uncontrolled oil spill into the waters of the Gulf of Mexico.

278.    Defendants recklessly, willfully and/or wantonly failed to utilize reasonably safe dispersant chemicals in its haphazard attempts to respond to the Spill, and thereby exacerbated and worsened the pollution of the Gulf of Mexico.

279.    In addition, after the blowout and before the well was finally sealed, BP was aware of procedures that would immediately block the flow of oil into the Gulf, yet it delayed the implementation of any such procedures, and limited its efforts to plug the well to options that would salvage the well for future use, instead of selecting procedures that would stop the flow of oil as soon as possible regardless of the well's continued functionality. As such, BP increased the magnitude of, and damage caused by, the Spill by willfully and/or wantonly and recklessly choosing its profits over the lives of the workers on the vessel, the safety of the environment, and the health, welfare, and value of the people, businesses, and property of the Gulf states

280.    Defendants' conduct was oppressive, wanton, malicious, reckless, or grossly negligent each time they:

        a)    failed to properly maintain and/or operate the Deepwater Horizon;

        b)    operated the Deepwater Horizon in such a manner the safety and integrity of the vessel and the well were disregarded to save time and money;

        c)    ignored warnings that the integrity of the well, the cementing job, and the vessel were in jeopardy;

        d)    failed to promulgate, implement, and enforce proper rules and regulations to ensure the safe operations of the Deepwater Horizon;

e)      violated MMS regulations for the safe design and operation of oil wells and drilling rigs in the Gulf of Mexico;

f)      failed to take appropriate action to avoid or mitigate the accident;

g)      failed to implement policies and procedures to safely conduct offshore operations in the Gulf of Mexico;

h)      failed to ensure that the Deepwater Horizon and its equipment were free from defects, properly maintained and/or in proper working order;

i)      failed to provide appropriate disaster prevention equipment;

j)      failed to have an appropriate emergency spill response plan or readily available spill response equipment.

281.    Defendants recklessly, willfully and/or wantonly caused or contributed to Plaintiffs' injuries by their tortious design, and reckless and wanton operation and use of chemical dispersants.

282.    Defendants willfully and/or wantonly failed to ensure that that adequate safeguards, protocols, procedures and resources would be readily available to prevent and/or mitigate the effects of an uncontrolled oil spill into the waters of the Gulf of Mexico and the corresponding clean up response measures involving the use of chemical dispersants.

283.    BP recklessly, willfully and/or wantonly failed to utilize reasonably safe dispersant chemicals in its haphazard attempts to respond to the Oil Spill, and thereby exacerbated and worsened the pollution of the Gulf of Mexico.

284.    Defendants' conduct, as described more fully hereinabove, is at the highest level of reprehensibility, warranting and necessitating the imposition of punitive damages at the highest level, because Defendants' conduct was motivated by financial gain; because it injured

and endangered human and environmental health and safety; because it caused devastating damage and loss to the livelihoods, businesses, and properties of Plaintiffs; because it was not isolated or accidental, but part of a culture and ongoing pattern of conduct that consistently and repeatedly ignored risks to others in favor of financial advantage to Defendants; and because it has accordingly caused societal harm, moral outrage and condemnation, and the need to punish Defendants and deter further repetition by Defendants or others.

285.    Accordingly, Plaintiffs are entitled to an award of punitive damages in an amount to be determined at trial.

WHEREFORE, the Plaintiffs demand judgment for damages against the Defendants, together with pre-judgment interest, costs and demands trial by jury of all issues so triable as of right by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants jointly severally and solidarily, and demands trial by jury of all issues triable as of right by jury, as follows:

1. Economic and compensatory damages in amounts to be determined at trial;

2. Punitive damages to be set by a jury;

3. Damages for medical screening and monitoring;

4. The implementation of medical screening and monitoring program to be funded by the Defendants;

5. Pre-judgment and post-judgment interest at the maximum rate allowable by law;

6. Attorneys' fees and costs of litigation;

7. Injunction to abate the public nuisance created by Defendants;

8.  Injunction to abate the unwanted, offensive conduct by Defendants;

9.  Injunction to require monitoring of air and water;

10. Any other and further relief available under all applicable state and federal

    laws;

11. Loss of enjoyment of life;

12. Physical disability, pain and suffering;

13. Past and future mental pain and suffering;

14. Past and future loss of income and benefits;

15. Past and future medical expenses;

16. Loss of family relationships;

17. Love and affection;

18. Loss of consortium; and

19. Any other damages available under state of federal law.

<div style="margin-left:40%">

Respectfully submitted,

KRUPNICK CAMPBELL MALONE
BUSER SLAMA HANCOCK LIBERMAN, P.A.

By: */s/   Kelley B. Stewart*

Kelley B. Stewart, Esquire
    Florida Bar Number:  492132
    kstewart@krupnicklaw.com
Michael J. Ryan, Esquire
    Florida Bar Number:  975990
    mryan@krupnicklaw.com
Joseph J. Slama, Esquire
    Florida Bar Number:  476171
    jslama@krupnicklaw.com
Jesse S. Fulton, Esquire
    Florida Bar Number:  112495
    jfulton@krupnicklaw.com

</div>

Kevin A. Malone, Esquire
     Florida Bar Number: 224499
     kmalone@krupnicklaw.com
Carlos A. Acevedo, Esquire
     Florida Bar Number: 0097771
     cacevedo@krupnicklaw.com
12 S.E. 7th Street, Suite 801
Ft. Lauderdale, Florida 33301-3434
(954) 763-8181 telephone
(954) 763-8292 facsimile

and

Michael G. Stag, Esquire
     Louisiana Bar Number: 23314
     mstag@smithstag.com
Merritt E. Cunningham
     Louisiana Bar Number: 32843
     mcunningham@smithstag.com
Ashley M. Liuzza, Esquire
     Louisiana Bar Number: 34645
     aliuzza@smithstag.com
Stephen H. Wussow, Esquire
     Louisiana Bar Number: 35391
     swussow@smithstag.com
Matthew D. Rogenes, Esquire
     Louisiana Bar Number: 36652
     mrogenes@smithstag.com
SMITH STAG, L.L.C.
One Canal Place, Suite 2850
365 Canal Street
New Orleans, Louisiana 70130
(504) 593-9600 telephone
(504) 593-9601 facsimile

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the above and foregoing Complaint has been served on All Counsel by electronically uploading the same to LexisNexis File & Serve in accordance with Pretrial Order No. 12, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2179, on this 11th day of April 2017.

Respectfully submitted,

KRUPNICK CAMPBELL MALONE
BUSER SLAMA HANCOCK LIBERMAN, P.A.


By: _/s/    Kelley B. Stewart_____

Kelley B. Stewart, Esquire
 Florida Bar Number: 492132
 kstewart@krupnicklaw.com
Michael J. Ryan, Esquire
 Florida Bar Number: 975990
 mryan@krupnicklaw.com
Joseph J. Slama, Esquire
 Florida Bar Number: 476171
 jslama@krupnicklaw.com
Jesse S. Fulton, Esquire
 Florida Bar Number: 112495
 jfulton@krupnicklaw.com
Kevin A. Malone, Esquire
 Florida Bar Number: 224499
 kmalone@krupnicklaw.com
Carlos A. Acevedo, Esquire
 Florida Bar Number:  0097771
 cacevedo@krupnicklaw.com
12 S.E. 7th Street, Suite 801
Ft. Lauderdale, Florida  33301-3434
(954) 763-8181 telephone
(954) 763-8292 facsimile

and

Michael G. Stag, Esquire
    Louisiana Bar Number:  23314
    mstag@smithstag.com
Merritt E. Cunningham
    Louisiana Bar Number:  32843
    mcunningham@smithstag.com
Ashley M. Liuzza, Esquire
    Louisiana Bar Number: 34645
    aliuzza@smithstag.com
Stephen H. Wussow, Esquire
    Louisiana Bar Number: 35391
    swussow@smithstag.com
Matthew D. Rogenes, Esquire
    Louisiana Bar Number: 36652
    mrogenes@smithstag.com
SMITH STAG, L.L.C.
One Canal Place, Suite 2850
365 Canal Street
New Orleans, Louisiana  70130
(504) 593-9600 telephone
(504) 593-9601 facsimile

*Attorneys for Plaintiffs*